IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | |
|---|---|
| **CURTIS J. WOOLWINE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO. 5:09-00575** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for child's insurance benefits based on disability and Supplemental Security Income (SSI), under Title XVI of the Social Security Act. By Standing Order entered May 21, 2009 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 13 and 14.)

The Plaintiff, Curtis J. Woolwine, (hereinafter referred to as "Claimant"), filed applications for Social Security Disabled Adult Child and SSI on September 1, 2006 (protective filing date), alleging disability as of October 29, 2003, due to left leg and ankle problems, back problems, diabetes, high blood pressure, reading and spelling difficulty, breathing problems, depression, and inability to sleep. (Tr. at 11, 64, 117-18, 121-23.) The claims were denied initially and upon reconsideration. (Tr. at 11.) On August 15, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 62.) The hearing was held on March 12, 2008, before the

Honorable Brian P. Kilbane. (Tr. at 25-47.) By decision dated March 28, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-24.) The ALJ's decision became the final decision of the Commissioner on April 17, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) Claimant filed the present action seeking judicial review of the administrative decision on May 21, 2009, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, February 22, 2001. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of lumbar degenerative disc disease, disorders of the left knee and foot, obesity, and borderline intellect. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [C]laimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he is restricted to simple, repetitive, unskilled work which does not require[] good reading or mathematic skills. The claimant cannot climb ladders/ropes/scaffolds and should avoid concentrated exposure to temperature extremes, excessive vibration, irritants such as fumes, odors, dusts, and gases, and hazards such as unprotected heights and moving machinery. However, the claimant can lift/carry twenty pounds occasionally and ten pounds frequently, can stand/walk about six hours in an eight hour workday, and can sit about six hours in an eight hour workday. He can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl and has no other significant manipulative, visual, communicative, or environmental limitations.

(Tr. at 20, Finding No. 5.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 22, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a hand packer,

silver wrapper, and food counter worker, at the light level of exertion. (Tr. at 23, Finding No. 10.) On this basis, benefits were denied. (Tr. at 23, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on May 17, 1981, and was 26 years old at the time of the administrative hearing, March 12, 2008. (Tr. at 13, Finding No. 1; 28, 115.) Claimant has a marginal/limited education, having completed the sixth or seventh grade and attended special education classes, and was able to communicate in English. (Tr. at 22, Finding No. 8; 29, 133, 140.) Claimant has no past employment. (Tr. at 22, Finding No. 6; 134.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that Claimant met or equaled Listing 12.05C. (Document No. 13 at 8-13.) Specifically, Claimant asserts that the ALJ did not address whether he manifested deficits of adaptive functioning prior to age 22. (Id. at 9.) Rather, the ALJ concluded that Claimant did not meet § 12.05C because his verbal IQ score of 70, as exhibited in Ms. Lucas' 2007 testing, was not valid. (Id. at 10-13.) Claimant asserts that the ALJ's decision is improper for three reasons. First, Claimant points out that Ms. Lucas did not indicate that the IQ scores achieved prior to 2007 were valid. (Id. at 10.) Nevertheless, the ALJ rejected Ms. Lucas's opinion that Claimant's scores placed him in the area of borderline intellectual functioning, and found, based on his own medical opinion, that the scores were invalid. (Id.) Claimant asserts that the ALJ should have re-contacted Ms. Lucas to determine whether she considered the 2007 scores to be valid. (Id.)

Second, Claimant asserts that the ALJ improperly concluded that a decrease in IQ scores between the ages of 13 and 26 were valid only if a head trauma or other event affected cognition. (Id. at 11.) Claimant points out that the Regulations indicate that IQ scores tend to stabilize by the age of 16, and that IQ scores above 40 achieved between the ages of seven and 16 are considered current for only two years. (Id.) Claimant therefore, contends that the ALJ improperly relied on IQ scores achieved when Claimant was 13 years of age. (Id.)

Finally, Claimant asserts that the Regulations do not require a diagnosis of mental retardation, and therefore, Ms. Lucas's diagnosis of borderline intellectual functioning did not

preclude a finding that Claimant met Listing § 12.05C. (Id.) Claimant contends that he suffered deficits of adaptive functioning before age 22. (Id. at 12.) Specifically, Claimant notes that he received special education classes while in school, he completed only the sixth or seventh grade, he continued to read at only a third grade level, he was unable to provide his mailing address on his Application for benefits, he was unable to provide the ALJ his Social Security Number, his sister helped him read his mail, he could not make change for a five dollar purchase, he had deficits in communication while in school, and he was never able to work outside the home. (Id.) Accordingly, Claimant contends that the ALJ's finding that he did not suffer from an impairment which met Listing § 12.05C is not supported by substantial evidence. (Id. at 12.)

The Commissioner asserts that the ALJ properly found that Claimant did not meet or equal Listing § 12.05C because his "I.Q. scores ranging from 82 to 90 were more reflective of his abilities than the later single verbal I.Q. scores of 70 obtained in connection with his application for benefits. (Document No. 14 at 11-12.) The Commissioner further argues that substantial evidence did not reflect a "lifelong impairment that would establish onset of the impairment before age 22 as required pursuant to the listing." (Id. at 12.) Based on the commentary accompanying Ms. Lucas's IQ scores, which indicated that Claimant had adequate attention, concentration, and memory, the Commissioner argues that the validity of the verbal IQ score of 70 is undermined. (Id. at 12-13.) The Commissioner also argues that other evidence in the record established that Claimant was not mentally retarded. (Id. at 13-16.) Specifically, the Commissioner asserts that earlier IQ testing revealed higher scores, Claimant was never diagnosed with mental retardation, Claimant's activities contradicted his claim of mental retardation, and Claimant did not establish significant deficits in adaptive functioning prior to age 22. (Id. at 14-16.) Accordingly, the Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision.

(Id.)

In Reply, Claimant asserts that to determine whether a claimant's IQ scores qualify under § 12.05C, the lowest score is considered. (Document No. 15 at 1.) Thus, it is irrelevant that his performance and full scale IQ scores, pursuant to Ms. Lucas's testing, met the criteria. (Id.) Claimant further asserts that pursuant to the Regulations, his IQ scores in 1995 from Ms. Lucas's first evaluation are invalid because he was only 14 years of age. (Id. at 2.) Furthermore, Claimant asserts that though the Commissioner argues that the commentary should be considered in determining the validity of Ms. Lucas's IQ scores, she did not indicate that her testing resulted in invalid scores. (Id.) Finally, Claimant asserts that a diagnosis of mental retardation is not required to meet § 12.05C, and that an "IQ of up to 75 can support a diagnosis of mental retardation based on deficits in adaptive functioning." (Id.)

Analysis.

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2008); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested

7

during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2008). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function;

OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. U.S. Dept. of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c) (2008). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C. Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also, The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999) (defining mental retardation as "significantly subaverage intellectual quotient with related limitations in two or more of the following: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.").[1] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, ("DSM-IV")(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well he meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting. Id. at 40. Thus, the Regulations make clear that Listing 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

---

[1] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning. Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

The record in this case disclosed that on May 12, 1995, Judith Lucas, M.A., a Psychologist, conducted a psychological evaluation of Claimant, when he was five days shy of his 14th birthday. (Tr. at 254-57.) Ms. Lucas noted that Claimant received failing grades in all academic areas except for writing, that he rarely completed assignments with a passing grade or on time, that he neither remained on task for the required amount of time or took notes, and that he reported difficulty reading, comprehending, spelling, and performing basic math skills. (Tr. at 254.) Though Claimant required one-on-one instruction, Ms. Lucas noted that he exhibited adequate peer and adult relationships. (Id.) Claimant's teachers reported speech difficulties, poor verbal skills and written language, below level math skills, and an inability to comprehend what he read. (Id.)

On a Wechsler Intelligence Scale for Children - Third Edition, Claimant achieved a verbal IQ of 90 (in the average range), a performance IQ of 82 (in the low-average range), and a full scale IQ of 85 (in the low-average range). (Tr. at 255.) Ms. Lucas determined that Claimant was functioning significantly below his ability levels in the areas of reading and written language, and that his math skills were "consistent with ability and do fall on grade level." (Tr. at 256.) His strengths were in the areas of abstract reasoning and social awareness. (Id.) His weaknesses included reading, written language, vocabulary skills, and visual attention to detail. (Id.) Ms. Lucas concluded that Claimant met the criteria for placement as a Learning Disabled student, that it would be helpful to test him orally at times, and that it would have been beneficial to have read and discussed the material orally in class. (Tr. at 256-57.)

In an Individualized Education Program assessment dated May 31, 1996, when Claimant was

in the sixth grade, Claimant's teacher, Rebecca Gilkeson, noted that he preferred to work independently and on written rather than oral work. (Tr. at 248.) Ms. Gilkeson noted that Claimant's daily living skills were appropriate for his age, and that he was able to do some cooking, make his bed, change linens, wash clothes, and put the clothes away. (Id.) Ms. Gilkeson further noted that Claimant understood the material that he read on a late third grade level and that his math skills were below his age level, but consistent with his grade level. (Tr. at 249.) Ms. Gilkeson recommended that Claimant attend special education classes only 14% of the school day. (Tr. at 251.)

When Claimant filed his first Application for Social Security disabled benefits as a child on January 4, 2001, the claims representative at the Social Security Administration ("SSA") noted that Claimant had difficulty answering questions and had to ask his mother every question. (Tr. at 146.) The representative also noted that Claimant did not know his mailing address and reported that he could read and write only a little. (Tr. at 145.) When Claimant filed his present Application for benefits on September 11, 2006, the claims representative noted that Claimant's sister helped him with the interview. (Tr. at 173.)

On November 27, 2006, Ms. Lucas conducted a second psychological evaluation of Claimant at the request of the SSA. (Tr. at 402-05.) On mental status evaluation, Claimant was cooperative, related appropriately, was able to carry on a conversation, exhibited relevant and coherent speech, and was oriented in all spheres. (Tr. at 403.) Claimant had no disturbance of mood, exhibited a broad affect, had logical and organized thought processes, and exhibited no evidence of delusions, preoccupations, or obsessions. (Id.) Ms. Lucas opined that Claimant's insight was fair and that he was able to interpret a proverb and answer a simple comprehension question. (Id.) His immediate memory was normal, recent memory was moderately deficient, and remote memory was fair. (Tr.

at 403-04.) His concentration and social functioning were mildly deficient, but his persistence and pace were within normal limits. (Tr. at 404.) Ms. Lucas diagnosed depressive disorder NOS, anxiety disorder NOS, and personality disorder NOS. (Id.) Neither intelligence nor educational achievement testing was done on the second evaluation.

Ms. Lucas evaluated Claimant a third time on February 8, 2007, at the request of the West Virginia Department of Health and Human Resources, when Claimant was 25 years old. (Tr. at 387-90.) Claimant reported having dropped out of school at the age of 16, when he was in the seventh grade, because the work was hard. (Tr. at 387.) He indicated that he was retained in the third grade and that he received special education services for spelling, reading, and math that began in the sixth grade. (Id.) On a Wechsler Adult Intelligence Scale - Third Edition, Claimant achieved a verbal IQ of 70, a performance IQ of 79, and a full scale IQ of 72. (Tr. at 388.) Claimant read and performed arithmetic at a third grade level. (Id.) He had difficulty making abstractions and generalizations, and his math skills were limited, but were adequate for managing his financial affairs. (Id.) Ms. Lucas observed that Claimant's pace was slow, his conversation was logical and spontaneous, and that he exhibited articulation difficulties, but that his speech was understood easily. (Tr. at 389.) Ms. Lucas noted that Claimant's effort was good. (Id.) She diagnosed anxiety disorder NOS and borderline intellectual functioning. (Tr. at 390.)

The record also disclosed opinions from state agency consultants. On December 4, 2006, Dr. Timothy Saar, Ph.D., completed a form Psychiatric Review Technique on which he opined that Claimant's depression, anxiety, and personality disorders were not severe impairments. (Tr. at 406-19.) Dr. Saar also opined that these mental impairments resulted in no more than mild limitations of activities of daily living, social functioning, and maintaining concentration, persistence, and pace.

(Tr. at 416.) He noted that Claimant had no episodes of decompensation of extended duration. (Id.)

On May 14, 2007, Dr. John Todd, Ph.D., a Licensed Psychologist, also completed a form Psychiatric Review Technique, in which he opined that Claimant's borderline intellectual functioning and anxiety disorder were not severe impairments. (Tr. at 455-68.) He also determined that these mental impairments resulted in no episodes of decompensation and only mild limitations of activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. at 465.)

In his decision, the ALJ summarized the medical evidence of record related to Claimant's mental condition and concluded that he suffered from borderline intellectual functioning, a severe impairment. (Tr. at 14.) In rating the "B" criteria, the ALJ concluded that Claimant had mild limitations in activities of daily living and in maintaining social functioning, concentration, persistence, and pace, and had no episodes of decompensation. (Tr. at 18.) Regarding § 12.05C, the ALJ found that the evidence of record did not establish mental capacity evidenced by "a valid verbal, performance, or full scale I.Q. of 60 through 70 with a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. at 19.)

In weighing the evidence of record from Ms. Lucas, the ALJ concluded that "the verbal I.Q. of 70 reported by Dr. Lucas is likely an underestimate of the [C]laimant's actual verbal abilities and is, therefore, not considered valid." (Tr. at 19.) The ALJ reasoned that Claimant had not incurred any "head trauma or other event that would be expected to affect cognition," since the IQ scores as reported by Ms. Lucas in 1995. (Id.) The ALJ noted earlier in his decision that Ms. Lucas also did not diagnose any cognitive impairment during her second evaluation on November 27, 2006. (Tr. at 17.) Essentially, the ALJ determined that Claimant's earlier IQ scores from 1995 were more

consistent with Claimant's overall abilities.

The Regulations provide that in determining whether a claimant has qualifying scores for § 12.05, the lowest score is considered. 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2008). Of Claimant's verbal, performance, and full scale scores achieved in 2007, the verbal IQ of 70, the lowest of the three scores, on its face, meets the criteria of a valid score for purposes of § 12.05C. The ALJ, however, found in the absence of any head trauma affecting Claimant's cognitive abilities, that this score was an underestimate of Claimant's verbal abilities. The Commissioner asserts that pursuant to the Regulations, the ALJ reviewed the commentary accompanying the IQ scores and properly determined that the commentary undermined the validity of the verbal IQ of 70.

The Regulations caution that the results of intelligence tests "are only part of the overall assessment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a) (2008). The Regulations state that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." Id. In the commentary accompanying Claimant's 2007 IQ scores, Ms. Lucas stated as follows:

> This would indicate functioning in the Borderline range according to Wechsler's classifications. Using Wechsler's Index scores, the client received a Verbal Comprehension score of 74, a Perceptual Organization score of 84, and a prorated Working Memory score of 73. The client had difficulty making abstractions and generalizations. Math skills are limited but do appear to be adequate for managing his financial affairs. Attention span and ability to concentrate were adequate for testing. Memory skills are delayed but are consistent with ability.

(Tr. at 388.) Subtest scores indicated reading and arithmetic levels at the third grade. (Id.) Ms. Lucas summarized Claimant's activities to have included watching television, playing video games,

occasionally doing the dishes or cooking, working puzzles, feeding the cat, and sometimes going to the store. (Tr. at 389.)

As Claimant points out, Ms. Lucas never stated that the scores were invalid, and the undersigned cannot find that her commentary of the reported scores rendered them invalid in the absence of further evidence. Though Claimant's 1995 IQ scores may be considered invalid under the Regulations given the passage of time between testing,[2] they are the only evidence of Claimant's intellectual functioning until the 2007 test results. Consequently, the undersigned finds that the ALJ's rejecting of the 2007 scores, without further evidence, was improper.

The undersigned further finds that the ALJ failed to consider the requirements of the introductory language of § 12.05, which makes the § 12.05C analysis, a three-step analysis. Pursuant to the introductory language of § 12.05, as stated above, a claimant must have had significant deficits in adaptive functioning that were manifested prior to the age of 22, to meet or equal the listing for mental retardation. Claimant's IQ scores prior to his 22nd birthday placed him in the average to low-average range, and the more recent scores placed him in the borderline range. The more recent verbal IQ score of 70 however, placed Claimant within the ambit of § 12.05C, despite not having been diagnosed with mental retardation. See Maresh v. Barnhart, 438 F.3d 897, 899 (8th

---

[2] The Regulations provide as follows:

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the tested IQ is 40 or above.

20 C.F.R., Part 404, Subpt. P, App. 1, § 112.00D(10) (2008).

Cir. 2006) (finding that the Listing's introductory paragraph does not require a formal diagnosis of mental retardation). The IQ scores during a claimant's developmental period are relevant, particularly to determine whether the claimant meets the introductory language of § 12.05. See Persinger v. Astrue, Civil Action No. 2:06-00383 (S.D.W.Va. Aug. 30, 2007).

The ALJ failed to address whether Claimant suffered any significant deficits in adaptive functioning prior to the age of 22. As Claimant points out, he attended special education classes while in school and he dropped out of school at the age of 16, when he was in the seventh grade. The 2007 report of Ms. Lucas established that Claimant continued to read at only a third grade level. Furthermore, the evidence reflected Claimant's inability to provide basic information on request, could not make change for a five dollar purchase, and required assistance in reading mail and completing forms. The undersigned is not making a finding as to the weight of these factors in determining whether deficits existed, but merely points them out to emphasize the ALJ's failure even to consider them as required by the Regulations.

Accordingly, to the extent that the ALJ rejected Claimant's 2007 IQ scores, failed to address all three components of the § 12.05C analysis, and therefore, found that Claimant did not meet the requirements of Listing § 12.05C, the undersigned finds that the ALJ's decision is not supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **REVERSE** the final decision of the Commissioner, **REMAND** this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: July 16, 2010.

R. Clarke VanDervort
United States Magistrate Judge